STATE OF CONNECTICUT *v.* PAUL F. MILLER
(AC 17160)

O'Connell, C. J., and Foti and Daly, Js.

Argued September 20—officially released December 21, 1999

*William F. Gallagher*, with whom, on the brief, were *Thomas J. Airone* and *H. Jeffrey Beck*, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *Jonathan Benedict*, state's attorney, and *Robert M. Brennan*, assistant state's attorney, for the appellee (state).

*Opinion*

DALY, J. This case is back before this court after *State* v. *Miller*, 34 Conn. App. 250, 641 A.2d 400, cert. denied, 230 Conn. 902, 644 A.2d 916 (1994), reversed the conviction of the defendant, Paul F. Miller, and was remanded for a new trial. The defendant appeals from the judgment of conviction, rendered after a jury trial, of larceny in the second degree in violation of General Statutes § 53a-123 (a) (2)[1] and engaging in the real estate business without a license in violation of General Statutes (Rev. to 1989) § 20-325.[2] The defendant claims that

---

[1] General Statutes § 53a-123 (a) provides in relevant part: "A person is guilty of larceny in the second degree when he commits larceny as defined in section 53a-119 and . . . (2) the value of the property or service exceeds five thousand dollars . . . ."

General Statutes § 53a-119 provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

[2] General Statutes (Rev. to 1989) § 20-325 (a) provides: "Any person who engages in the business of real estate broker, real estate salesman, real estate appraiser or residential appraiser without obtaining a license as herein provided, shall be fined not more than one thousand dollars or imprisoned not more than six months or both, and shall be ineligible to obtain a license for one year from the date of conviction of such offense, except that the commission, in its discretion, may grant a license to such person within such one-year period upon application and after a hearing thereon."

the trial court improperly (1) admitted prior testimony of three witnesses who were unavailable to testify, (2) denied a posttrial motion to impeach the verdict and to examine the jury for possible misconduct and (3) sentenced the defendant on the basis of a stale and erroneous presentence investigation report. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant represented to potential home buyers that he was a licensed real estate broker and that he owned several properties he could rent or sell to them at low cost. The defendant, however, was not so licensed nor did he own the properties. These misrepresentations resulted in the defendant's wrongfully receiving money from three potential buyers for rent, mortgage application fees or down payments. The defendant had placed in the Bridgeport Post an advertisement that read, "House for Sale, No Money Down." Subsequently, he met with the potential buyers and made offers to rent, to rent with an option to buy or to sell them properties in the Bridgeport area. During those meetings, the defendant falsely stated that he was either a real estate broker, real estate agent or mortgage broker. The defendant also did not have any legal interest in the properties and never obtained permission from their owners to negotiate their transfers. Nevertheless, the defendant entered the premises, showed the properties to the potential buyers and, in one case, made renovations to the property. He also negotiated various contracts with the three buyers, including a rental agreement and purchase contracts. These negotiations led to the defendant's receipt of checks representing rent, mortgage application fees or down payments.

I

The defendant claims first that the trial court improperly admitted the prior testimony of three witnesses,

Attorney Richard Holmes, Mark Anthony Potter and Alfred J. Bianco, without an adequate showing that they were unavailable to testify in court. " '[T]he trial court has broad discretion in determining whether the proponent has shown a declarant to be unavailable. A trial court's determination of the unavailability of a witness will be overturned only if there has been a clear abuse of discretion.' *State* v. *Lapointe*, 237 Conn. 694, 738, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996); accord *State* v. *Rivera*, 221 Conn. 58, 62, 602 A.2d 571 (1992)." *State* v. *Schiappa*, 248 Conn. 132, 141, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999).

"Prior testimony of an unavailable witness is admissible in a subsequent trial as long as it satisfies a two part test. . . . First . . . [t]he prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant. . . . [Second] [e]ven after the declarant is satisfactorily shown to be unavailable, his statement is admissible only if it bears adequate indicia of reliability . . . which serve to afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement." (Citation omitted; internal quotation marks omitted.) *State* v. *Pugh*, 45 Conn. App. 261, 268, 696 A.2d 354, cert. denied, 242 Conn. 910, 697 A.2d 368 (1997).

### A

"[T]he question of whether an effort to locate a missing witness has been sufficiently diligent to declare that person unavailable is one that is inherently fact specific and always vulnerable to criticism, due to the fact that one, in hindsight, may always think of other things." (Internal quotation marks omitted.) Id., 269.

Evidence was presented demonstrating that Michael O'Connor, an investigator for the state's attorney's office, had searched for each of the three witnesses.

When called to testify as to unavailability, O'Connor testified that he checked Holmes' address with the department of motor vehicles and, approximately two weeks prior to trial, went to Holmes' last known address, Lamplighter Lane, Fairfield, with a subpoena. Holmes was not present, but his estranged wife indicated that he had moved to Vermont. O'Connor testified further that Holmes was not listed as an attorney licensed to practice law in Connecticut. As to Potter's unavailability, O'Connor testified that after determining that Potter had no listing with the department of motor vehicles, he went to Potter's last known address, South Beach Avenue, Old Greenwich. O'Connor indicated that Potter was not there, but a neighbor across the hall volunteered that Potter had moved to either Washington, D.C., or the state of Washington. O'Connor further testified that the department of motor vehicles records indicated that Bianco's license had expired. Thereafter, O'Connor went to Bianco's last listed address, Selensky Drive, Stratford,[3] where the present occupant indicated that the Biancos had divorced and that Bianco had left the state two and one-half years before and might be living in Las Vegas, Nevada.

The established rule is that "[a] proponent's burden is to demonstrate a diligent and reasonable effort, not to do everything conceivable, to secure the witness' presence. See *United States* v. *Potamitis*, 739 F.2d 784, 789 (2d Cir.), cert. denied, 469 U.S. 918, 105 S. Ct. 297, 83 L. Ed. 2d 232 (1984)." *State* v. *Lopez*, 239 Conn. 56, 77–78, 681 A.2d 950 (1996). On the basis of the foregoing, we conclude that the unavailability of the witnesses was satisfactorily proved. We next consider whether the witnesses' statements bear an adequate indicia of reliability so as to allow their admission.

---

[3] It is noteworthy to mention that the defendant had listed Bianco as his witness at the same address.

## B

"[Our Supreme Court] and the United States Supreme Court have declared that prior testimony of an unavailable witness is admissible in a subsequent trial as an exception to the hearsay rule. . . . As long as the trial court finds the requisite 'indicia of reliability' in the former testimony, such as the opportunity to cross-examine the declarant fully, the testimony is admissible." (Citations omitted.) *State* v. *Torres*, 210 Conn. 631, 645–46, 556 A.2d 1013 (1989); see *State* v. *Lapointe*, supra, 237 Conn. 737–38 (statement of unavailable declarant that bears adequate indicia of reliability serves to afford trier of fact satisfactory basis for evaluating truth of prior statement).

Here, the state called Andrea Mazur, a court reporter, to testify that the transcripts being offered were in fact the recorded transcripts of the prior proceeding. After hearing Mazur's testimony as well as defense counsel's objection regarding the reliability of the proffered testimony and that the transcripts were not original transcripts, the following colloquy ensued:

"The Court: All right. Well, can we agree that these are transcripts from a prior trial in this matter?

"[Defense Counsel]: I don't think—yeah, I don't think there's any doubt of that.

"The Court: All right. And can we agree that the witnesses were administered oaths? . . .

"[Defense Counsel]: If—if that's the document [then it] speaks for itself. I'm not going to question that.

"The Court: All right. Can we agree that each witness was subject to cross-examination, if not actually cross-examined?

"[Defense Counsel]: Yes.

"[Assistant State's Attorney]: Yes.

"The Court: All right. And can we believe that these are accurate reproductions of the words spoken?

"[Assistant State's Attorney]: The state believes so.

"[Defense Counsel]: Based on the court reporter's testimony, I don't have any reason to doubt it.

\* \* \*

"The Court: I'm going to make a finding that these transcripts are, in fact, reliable. I'm also going to over-rule the defendant's objection that because these are not original transcripts that they're not admissible for the reason that the original transcripts, as the witness has testified, would have been sent to the ordering party. It's a different office. And the witness did review the transcripts, and they appeared to be the [witness'] complete copy of the originals, so I don't think there's any question that these are, in fact, reliable."

It is clear from the foregoing that the trial court found the requisite indicia of reliability necessary to admit the prior testimony of the unavailable witnesses. More-over, on the basis of our review of the record, we con-clude that even if the trial court improperly admitted these documents, their admission was harmless, as the testimony of Holmes and Potter was merely cumulative, while Bianco's testimony was favorable to the defen-dant.[4]

---

[1] Holmes' testimony indicated that he had ordered a title search for 464 Light Street, Stratford, which disclosed that Bankmart was the owner of the property, not the defendant. Potter's prior testimony revealed that he had been head of Bankmart's real estate management department and that the premises at 464 Light Street, Stratford, had been obtained by Bankmart via foreclosure, and that the defendant never had permission to rent, buy or renovate the premises. Finally, the testimony of Bianco, a witness for the defense in the prior proceeding, was beneficial to the defendant in that Bianco confirmed that the defendant had a contract to buy a certain parcel of property, conforming to his defense that he was merely attempting to arrange "flip" transactions that never materialized. A "flip" transaction is one in which an individual enters into an agreement to purchase a piece of

## II

The defendant claims next that the trial court improperly denied his motion to impeach the verdict because of juror misconduct in that the jurors deliberated when they were not supposed to do so in contravention of the court's instructions. We disagree.

The following facts will be helpful to our disposition of this issue. On December 14, 1995, the trial court charged the jury, and, at approximately 11:30 a.m., the jury began deliberating. During the trial, the court, on numerous occasions, gave the jurors, inter alia, a standard admonition not to discuss the case with anyone until allowed to do so by the court. At about 12:10 p.m., the jury sent a note that asked: "We are questioning liens on [Augustine Ofili's] property. Are they still standing?" Due to a playback problem with the courtroom tape recording device, the court told the jury that it would have a readback of testimony at 2 p.m., asked the jurors not to discuss the case among themselves until instructed to do so and excused them for lunch at 1 p.m. The playback problem persisted from 2 p.m. to 3 p.m., when the jury was called out, informed of the situation and given the option of waiting for five to ten minutes or returning the following day to resume deliberations.[5] The jurors returned to the jury room to discuss this matter, and a few minutes later at 3:04 p.m. sent out a note stating, "We've asked to withdraw our question," and that they would prefer to conclude that day. At 3:19 p.m., the jury sent out a third note indicating that it had reached a verdict. The jury returned, rendered its verdict and was discharged. The defendant made no objections at this point, and the court adjourned. On January 19, 1996, more than five weeks

property, and then rehabilitates it or immediately sells it to a prospective buyer for a profit upon the acquisition of the requisite legal rights.

[5] The court clerk's office closed that day at 3 p.m. due to inclement weather.

after the verdict was rendered, the defendant filed a motion to impeach the verdict and requested an examination of the jurors. The defendant requested in the motion that a hearing be held possibly to impeach the verdict if evidence of juror misconduct was disclosed.

"[A]ppellate review of a trial court's decision granting or denying a motion [to impeach the verdict] must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. . . . [W]e have . . . accordingly confined our role to a determination of whether there has been an abuse of discretion. . . . Claims of juror misconduct fall within this rule of limited review." (Internal quotation marks omitted.) *State* v. *Rhodes*, 248 Conn. 39, 48, 726 A.2d 513 (1999).

During oral argument, this court ordered the parties to file supplemental briefs on the effect of *State* v. *Brown*, 235 Conn. 502, 525–26, 668 A.2d 1288 (1995), in which our Supreme Court established the rule that on an allegation of juror misconduct, the trial court must, pursuant to its supervisory authority, sua sponte, order an investigatory hearing to determine whether possible misconduct had occurred. *Brown* involved an external factor, an anonymous letter, brought to the trial court's attention after the verdict but prior to sentencing, while the jury was still empaneled. In the present case, there was no such obvious factor that would require the court to conduct, sua sponte, an investigatory hearing. Indeed, defense counsel did not bring any allegation of possible juror misconduct to the court's attention until the defendant filed his motion to set aside the verdict more than five weeks after the verdict had been rendered, which was long after the jury had been discharged.

The essence of the defendant's claim is that the jury deliberated in contravention of the trial court's admonitions not to do so. The defendant's contention is based

on the following facts. The jury was called back at approximately 3 p.m., sent to the jury room to decide whether it wanted to continue deliberations that day, sent out a note at 3:04 p.m. indicating that it was withdrawing its question and, finally, sent out another note fifteen minutes later indicating that it had reached its verdict. While not explicitly stating so, the defendant's contention that the jury deliberated in contravention of the court's orders, coupled with these facts, implies that the jury could not have reached a verdict in the time that it did had it not been deliberating when it was specifically instructed not to do so. The defendant chooses, however, to downplay the fact that the jury had already deliberated for approximately three quarters of one hour prior to sending out the question that it later withdrew. Moreover, we cannot infer misconduct from the duration of the jury's deliberation. " 'The length of time that a jury deliberates has no bearing on nor does it directly correlate to the strength or correctness of its conclusions or the validity of its verdict. In fact, the length of time of the jury's deliberations is a double-edged sword. A short deliberation, rather than being indicative of a lack of diligence, may in fact attest to the strength of the [prevailing party's] case.' *State* v. *Hernandez*, 28 Conn. App. 126, 136, 612 A.2d 88, cert. denied, 223 Conn. 920, 614 A.2d 828 (1992)." *Baldwin* v. *Jablecki*, 52 Conn. App. 379, 384, 726 A.2d 1164 (1999).

Furthermore, our Supreme Court stated in *State* v. *Castonguay*, 194 Conn. 416, 436, 481 A.2d 56 (1984), that while the trial court in that case had improperly instructed the jury that it could discuss the case prior to entering formal deliberations, "we certainly will not accept the defendant's speculation that the jurors did in fact discuss the evidence and evaluate it." Id. We likewise will not indulge in such speculation and conclude, therefore, that the court did not improperly deny the defendant's motion to impeach the verdict.

## III

The defendant claims finally that the trial court improperly sentenced him on the basis of a stale and erroneous presentence investigation report (PSI). The defendant claims that the preparer relied primarily on information contained in a report prepared more than four years before the date of sentencing and that the current PSI included inaccurate, inflammatory and untrue information. We disagree.

"The 'sole purpose [of a PSI] is to enable the court, within limits fixed by statute, to impose an appropriate penalty, fitting the offender as well as the crime.' . . . The primary value of a PSI stems from the information contained therein, not from the report itself. Most of this information can be brought to the trial court's attention by either party by means other than a PSI." (Citation omitted.) *State* v. *Patterson,* 236 Conn. 561, 574–75, 674 A.2d 416 (1996).

The defendant represented to the sentencing court that the PSI preparer had used a PSI previously written for the defendant's first trial, and that the preparer did not promptly inquire into the circumstances of the offense as required by General Statutes § 54-91a (c),[6] but instead merely attempted to contact the defendant only ten days prior to sentencing by going to his home unannounced.

In response to defense counsel's concern, the trial court stated: "[W]hat we have is a prior PSI prepared several years ago. I would agree with you that if that was all that was tendered to the court, nothing more, that I wouldn't allow any sentencing proceeding to go

---

[6] General Statutes § 54-91a (c) provides in relevant part: "Whenever an investigation is required, the probation officer shall promptly inquire into the circumstances of the offense, the attitude of the complainant or victim, or of the immediate family where possible in cases of homicide, and the criminal record, social history and present condition of the defendant. . . ."

on today. The fact of the matter is, though, that I think probation can justifiably rely on the factual recitation in that [PSI], even though [it was] made several years ago, to be an accurate statement of events up to that time. So, what probation is now doing is updating any information they have from the time of the prior PSI to the present. As far as the visit to the home goes, I have—haven't been given anything that the unannounced visit to the home and a request to see [the defendant] . . . was any breach of protocol by the probation department and it certainly doesn't offend the court, either the timing of it or the fact of it itself. When he was told that the defendant wasn't home and the wife refused to permit entry to speak to him further, he left. It indicates that the probation officer did make an appointment to see [defense counsel] and [the defendant], and it's your right, of course, to be here under the Practice Book. Did make an appointment. I assume so the probation officer could update the information, but that the appointment was canceled by you and [the defendant] . . . . You and your client would—felt that information was pertinent that could have been included in this probation report, could have made a tender to probation in many different ways other than an interview, and to come to the sentencing today and to complain about the circumstances of the PSI and its update, I think really misses the mark. I don't think that this [PSI], both the old one and the current one, are anything less than reliable based on the information that was available to probation to give to the court, and I don't believe that probation acted in any way other than diligently to prepare this report and to prepare this update and furnish it to the court for sentencing."

The sentencing court went on to state further: "All right. I want to assure you and put on the record that any sentence to be imposed is going to be based upon

the evidence in this case, the record in this case, as well as the information contained in the [PSI]."

It is clear that the defendant was accorded the opportunity at the time of sentencing to bring any other relevant information to the court's attention, but failed to do so. It is also clear that the sentencing court considered the admittedly old PSI as only one factor in the sentencing equation and not the sole determinant. The defendant's claim, therefore, is without merit.

The judgment is affirmed.

In this opinion the other judges concurred.