STATE OF CONNECTICUT *v.* ABDUL PEAY
(AC 25307)

Schaller, Harper and Stoughton, Js.

Argued March 23—officially released July 11, 2006

*Katharine S. Goodbody*, special public defender, for the appellant (defendant).

*Melissa Streeto Brechlin*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, *Richard Morelli*, supervisory assistant state's attorney, and *Carl R. Ajello III*, assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Abdul Peay, appeals from the judgment of conviction, rendered after a jury trial, of burglary in the first degree in violation of General Statutes § 53a-101 (a) (1), burglary in the first degree in violation of General Statutes § 53a-101 (a) (2), assault in the second degree in violation of General Statutes § 53a-60 (a) (2) and interfering with an officer in violation of General Statutes § 53a-167a (a).[1] The defendant claims that (1) his conviction of two counts of burglary violated the constitutional prohibition against double jeopardy, (2) the court improperly disallowed certain evidence, (3) the evidence was insufficient to support his conviction of any of the crimes of which he stands convicted and (4) the court improperly relied on an inaccurate presentence investigation report at the time of sentencing. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have made the following findings of fact. On April 17, 2003, Edwin Carter was the superintendent of an apartment building in Hartford. Generally, Carter had maintenance and caretaking duties in and around the building. Carter lived in an apartment in

---

[1] The court sentenced the defendant to a total effective term of incarceration of twelve years.

the building's basement, near the laundry room. The laundry room, like most areas of the building, was not an area of the building open to the public and was accessible only through locked security doors. Tenants and other authorized persons possessed keys with which to gain access to these areas.

At approximately 11:30 p.m., Carter heard noises coming from the laundry room. Carter went to the doorway of the laundry room and observed the defendant standing near a coin operated laundry machine. The defendant was not a tenant of the building. Carter asked the defendant what he was doing there. The defendant, who was attempting to pry open the coin box on a laundry machine, replied, "[w]hat does it look like?" The defendant moved toward Carter, while Carter was standing in the laundry room's doorway, and struck him on the head with a crowbar, causing a significant injury.

The defendant ran from the laundry room. Carter, despite feeling the ill effects of his head injury, pursued the defendant and pulled him to the ground. The defendant made his way to the building's lobby, where he and Carter continued to "wrestle" with each other. The defendant attempted to strike Carter with a Sheetrock knife and a screwdriver and bit Carter on the chest. After breaking a glass door in the lobby, the defendant made his way to the small lawn in front of the building. Carter pursued the defendant outside and began shouting for assistance. Carter restrained the defendant against a fence until the police arrived.

Brian Salkeld and Shawn St. John, officers with the Hartford police department, then separated the defendant and Carter. The officers spoke with witnesses at the scene, including Carter. Carter recounted the relevant events that had transpired, and the officers investigated the laundry room. On the basis of their interviews and their investigation of the laundry room, which

revealed evidence of the defendant's efforts to pry open the coin boxes on two laundry machines, the officers decided to place the defendant under arrest and take him into police custody. When the officers attempted to place handcuffs on the defendant, the defendant became hostile and uncooperative. The officers physically struggled with the defendant as they handcuffed him. The defendant shouted threats at the officers; he disobeyed or was slow to comply with the officers' various commands.

I

The defendant first claims that his conviction of the two counts of burglary in the first degree violated the constitutional prohibition against double jeopardy. We will review the defendant's unpreserved double jeopardy claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[2] and conclude that no constitutional violation exists.[3]

---

[2] The defendant did not preserve this issue for our review. Prior to the start of trial, the defendant, representing himself, argued that the two burglary charges were the same offense and violated his double jeopardy rights. The defendant thereafter was represented by a public defender. The court ruled that the defendant's double jeopardy issue was raised prematurely but that the defendant could raise the issue at a later time, if the state obtained a conviction on both counts of burglary. The record does not reveal that the defendant raised the issue after his conviction. The defendant did not preserve the issue by raising it prematurely and failing to raise it at an appropriate time. In the context of a single trial, the double jeopardy clause protects against *multiple punishments*, not multiple charges, that arise from the same act or transaction and are related to a single criminal offense. *State* v. *D'Antonio*, 274 Conn. 658, 715, 877 A.2d 696 (2005).

Although the defendant asserts that he preserved this issue at trial, he nevertheless argues that the issue is reviewable under *State* v. *Golding*, supra, 213 Conn. 239–40. We agree that the claim is reviewable under *Golding* because the record is adequate for review and the claim is of constitutional magnitude. "A defendant may obtain review of a double jeopardy claim, even if it is unpreserved, if he has received two punishments for two crimes, which he claims were one crime, arising from the same transaction and prosecuted at one trial . . . ." (Internal quotation marks omitted.) *State* v. *Nixon*, 92 Conn. App. 586, 590, 886 A.2d 475 (2005).

[3] In his principal brief, the defendant makes only passing reference to article first, § 9, of the Connecticut constitution in the context of his claim.

The double jeopardy clause of the fifth amendment to the United States constitution provides: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . ." The double jeopardy clause of the fifth amendment, which "represents a fundamental ideal in our constitutional heritage," is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. *Benton* v. *Maryland*, 395 U.S. 784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969). "The fifth amendment's prohibition of double jeopardy protects persons against (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction and (3) multiple punishments for the same offense in a single trial." *State* v. *Brooks*, 88 Conn. App. 204, 214–15, 868 A.2d 778, cert. denied, 273 Conn. 933, 873 A.2d 1001 (2005).

The defendant's claim that he was improperly convicted of two counts of burglary in the first degree in violation of § 53a-101 (a) (1) and (2) involves the third category of double jeopardy analysis. "Double jeopardy analysis in the context of a single trial is a two-step process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions

His argument appears to be based on the guarantees of the fifth amendment to the United States constitution. Our Supreme Court has recognized "that the due process guarantees of article first, § 9, [of the Connecticut constitution] include protection against double jeopardy." (Internal quotation marks omitted.) *State* v. *Miranda*, 260 Conn. 93, 119, 794 A.2d 506, cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002). "Connecticut appellate courts never have held [however] that the double jeopardy guarantees implied in the state constitution exceed those embodied in the federal constitution." *State* v. *Michael J.*, 274 Conn. 321, 354, 875 A.2d 510 (2005). Nonetheless, as the defendant has not separately briefed or analyzed a double jeopardy claim under our state constitution, our analysis is limited to the claim raised under the federal constitution. See *State* v. *Vega*, 259 Conn. 374, 384 n.15, 788 A.2d 1221, cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002).

are met." (Internal quotation marks omitted.) *State* v. *Woodson*, 227 Conn. 1, 7, 629 A.2d 386 (1993).

It is clear from our reading of the state's long form information and undisputed by the parties that the burglary offenses of which the defendant was convicted arose out of the same transaction or occurrence. Our analysis is tailored to determining whether the two burglary offenses are the same for double jeopardy purposes. The defendant argues that subdivisions (1) and (2) of § 53a-101 (a)[4] are "conceptually indistinct" and not separate offenses. The defendant posits that these subdivisions codify alternate methods of committing the crime of burglary in the first degree, not separate offenses. Essentially, the defendant argues that he was punished twice for the same conduct because he was convicted of multiple violations of the same statutory provision, § 53a-101 (a), and that the legislature did not authorize by means of that provision multiple punishments for the single criminal act or transaction at issue. The state argues that subdivisions (1) and (2) of § 53a-101 (a) codify distinct offenses for purposes of double jeopardy. The state argues that the defendant was convicted of two separate offenses during a single criminal transaction and that his conviction, therefore, did not violate double jeopardy principles. We agree with the state.

"The test for determining whether two charged offenses constitute the same offense for double jeopardy purposes was set forth in *Blockburger* v. *United*

---

[4] General Statutes § 53a-101 (a) provides in relevant part: "A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and: (1) He is armed with explosives or a deadly weapon or dangerous instrument . . . ."

General Statutes § 53a-101 (a) provides in relevant part: "A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and . . . (2) in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone."

*States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932). [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. . . . In conducting this inquiry, we look only to the relevant statutes, the information, and the bill of particulars, not to the evidence presented at trial. . . . The issue, though essentially constitutional, becomes one of statutory construction." (Citations omitted; internal quotation marks omitted.) *State* v. *Woodson*, supra, 227 Conn. 8–9. "Under the *Blockburger* test, a defendant may be convicted of two offenses arising out of the same criminal incident if each crime contains an element not found in the other." (Internal quotation marks omitted.) *State* v. *Tweedy*, 219 Conn. 489, 495, 594 A.2d 906 (1991). "The term 'element' as used in the *Blockburger* analysis . . . means any fact that the legislature has deemed essential to the commission of the crime." *State* v. *Woodson*, supra, 10.

Our review of § 53a-101 (a) and the state's long form information reveals that the crimes of burglary in the first degree in violation of § 53a-101 (a) (1) and burglary in the first degree in violation of § 53a-101 (a) (2) each contain an element that the other does not.[5] To convict the defendant under § 53a-101 (a) (1), the state had to prove, as alleged in count one of the state's long form

---

[5] In count one of the long form information, the state charged the defendant with having violated General Statutes § 53a-101 (a) (1) in that, "on or about April 17, 2003 . . . the defendant entered and remained unlawfully in a building with the intent to commit a crime therein and was armed with a dangerous instrument." In count two of the long form information, the state charged the defendant with having violated § 53a-101 (a) (2) in that, "on or about April 17, 2003 . . . the defendant entered and remained unlawfully in a building with the intent to commit a crime therein and in the course of committing the offense, he intentionally, knowingly, and recklessly inflicted bodily injury to another person."

information, that the defendant entered or remained unlawfully in a building with the intent to commit a crime therein and that he was armed with a dangerous instrument. To convict the defendant under § 53a-101 (a) (2), the state had to prove, as alleged in count two of the state's long form information, that the defendant entered or remained unlawfully in a building with the intent to commit a crime therein and that in the course of committing the crime, he intentionally, knowingly or recklessly inflicted bodily injury on another person.

Under *Blockburger*, the offenses at issue are separate for double jeopardy purposes. The *Blockburger* test is a rule of statutory construction; its application does not give rise to a conclusive presumption of law. *State* v. *Lonergan*, 213 Conn. 74, 88 n.5, 566 A.2d 677 (1989), cert. denied, 496 U.S. 905, 110 S. Ct. 2586, 110 L. Ed. 2d 267 (1990), overruled in part by *State* v. *Alvarez*, 257 Conn. 782, 794–95, 778 A.2d 938 (2001). Application of the test "should not be controlling where, for example, there is a *clear indication* of contrary legislative intent." (Emphasis in original; internal quotation marks omitted.) *State* v. *Delgado*, 19 Conn. App. 245, 251, 562 A.2d 539 (1989).

The defendant did not address the *Blockburger* test in his principal brief and, in his reply brief, argued that the proof necessary to convict him of the two crimes at issue was "basically the same" and that the two crimes are "really the same crime." The defendant has not provided this court with any discussion or analysis of the legislative intent underlying the subdivisions of the statute at issue.[6] Accordingly, he has failed to rebut

---

[6] To the extent that the defendant suggests that the legislature's inclusion of both offenses within the same statute is controlling with regard to the double jeopardy issue, he is not on solid footing. An argument of this nature was rejected by our Supreme Court in *State* v. *Woodson*, supra, 227 Conn. 11–13. In *Woodson*, the defendant was convicted of two counts of arson in the first degree in violation of General Statutes § 53a-111 (a) (3) and (4). *State* v. *Woodson*, supra, 6. The court applied the *Blockburger* test and concluded that the statutory provisions codified separate offenses for pur-

the presumption created by application of the *Blockburger* test. See *State* v. *Brooks*, supra, 88 Conn. App. 217; *State* v. *Barnett*, 53 Conn. App. 581, 602–603, 734 A.2d 991, cert. denied, 250 Conn. 918, 738 A.2d 659 (1999). The defendant has failed to demonstrate that his conviction of both counts of burglary was improper. Accordingly, his claim fails under *Golding*'s third prong.

## II

The defendant next claims that the court improperly excluded two sound recordings from being admitted into evidence. We disagree.

"Unless an evidentiary ruling involves a clear misconception of the law, [t]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling . . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice and injustice." (Internal quotation marks omitted.) *State* v. *Smith*, 275 Conn. 205, 219, 881 A.2d 160 (2005).

poses of double jeopardy. Id., 9. The defendant sought to rebut the presumption created by the *Blockburger* analysis, contending "that had the legislature intended to create two different crimes, it would necessarily have placed the elements of each course of conduct . . . in discrete sections of the General Statutes." Id., 11. In rejecting this argument, the court stated: "[T]he mere position of statutory language in the hierarchy of sections and subsections in the penal code does not control whether such language creates a separate offense for the purpose of double jeopardy analysis." Id. For purposes of double jeopardy analysis, "the language of the provisions rather than where they are situated is more indicative of whether the legislature intended to create separate crimes and punishments." Id., 12; see also *State* v. *Tweedy*, supra, 219 Conn. 494–96; *State* v. *McColl*, 74 Conn. App. 545, 566–75, 813 A.2d 107, cert. denied, 262 Conn. 953, 818 A.2d 782 (2003); *State* v. *Smart*, 37 Conn. App. 360, 364–70, 656 A.2d 677, cert. denied, 233 Conn. 914, 659 A.2d 187 (1995).

Natalee Kelly testified in relevant part as follows: On April 17, 2003, Kelly was a resident of the apartment building at which the events at issue occurred. As she was preparing to go to bed that night, she heard a commotion. Kelly went downstairs to the building's lobby, where she observed Carter and the defendant fighting. She immediately returned to her apartment where she called the police and reported that "there was a fight outside [her] apartment." After calling the police, she returned to the lobby, where she observed Carter and the defendant fighting on the lawn in front of the building. Kelly observed that Carter had sustained an injury. Kelly shouted for others in the building to come outside and assist Carter. Two men assisted Carter in restraining the defendant.

Subsequently, outside of the presence of the jury, the defendant's attorney asked the court to admit into evidence two sound recordings of calls placed to the 911 dispatcher of the Hartford police department. The defendant's attorney represented that the first recording was of a 911 call made by Kelly and that the second recording was of a subsequent 911 call by an "unidentified caller." The defendant's attorney represented that the recordings did not reflect the time of the calls, but that it was clear that the events at issue in the trial were the subject of the calls. The court heard the recordings at issue outside of the jury's presence. Each will be discussed in turn.

The first recording depicted the following colloquy:

"[The Dispatcher]: Hartford police emergency.

"[The Caller]: Hi. You need to come to 18 Niles Street. Somebody is about to get hurt right now.

"[The Dispatcher]: What is the problem?

"[The Caller]: There is a big fight.

"[The Dispatcher]: Outside?

"[The Caller]: Yeah.

"[The Dispatcher]: Any weapons?

"[The Caller]: I don't know. I don't know.

"[The Caller]: Huh.

"[The Dispatcher]: All right. All right. Bye-bye."

The defendant's attorney asked the court to admit the recording as a prior inconsistent statement for the purpose of impeaching Kelly's testimony. The defendant's attorney argued that Kelly represented during the 911 call that there was a "big fight" in progress and that the fight was occurring outside of the building. The defendant's attorney argued that these representations contradicted Kelly's testimony at trial that, before she called 911, the fight was occurring indoors and that the fight was between just two persons. The defendant's attorney agreed with the court's observation that the recording would also help the defense in that it would make it more likely that the defendant was not inside of the building when Kelly observed him. The defendant's attorney further argued that the statement was admissible as a spontaneous utterance by Kelly.

The court disallowed this first recording on the ground that the defendant had not authenticated the recording. Specifically, the court observed that the defendant had not called a witness or presented any evidence to demonstrate that Kelly was, in fact, the caller in the recording. The prosecutor declined to stipulate that the caller in the recording was Kelly. The court observed that the parties had already finished examining Kelly and that the defendant's attorney did not inquire of her as to whether she was the caller in the recording. Apart from ruling that the recording had not been authenticated properly, the court also ruled that

the recording was not admissible as a prior inconsistent statement; the court determined that the statement was not inconsistent with Kelly's trial testimony.

The second recording depicted the following colloquy:

"[The Dispatcher]: Hartford police, 911.

"[The Caller]: Hi. I live on 18 Niles Street, and it looks like the super[intendent] from my building is fighting with someone [on] the front lawn—

"[The Dispatcher]: Okay.

"[The Caller]: —lawn.

"[The Dispatcher]: We got it. Any weapons?

"[The Caller]: I think so. I think he is holding it right now. The super[intendent] is holding something.

"[The Dispatcher]: You don't know what it is?

"[The Caller]: No, I don't.

"[The Dispatcher]: Okay. What—they were already on their way.

"[The Caller]: Okay. Thank you.

"[The Dispatcher]: Thank you. Bye-bye."

The defendant's attorney represented that this second recording was a "spontaneous" call made to the police by an unknown caller. The defendant's attorney argued that the defense did not have the ability to identify the caller, stating that there was "no feasible way" for the defense to obtain the caller's testimony at trial. The defendant's attorney nonetheless argued that it was reasonable to infer that the caller lived in the apartment building and that she made the call as she was looking out of her window at Carter, whom she had recognized. The defendant's attorney further argued that it was

reasonable to infer that the call had been made subsequent to the time of Kelly's call in that the dispatcher indicated that the police were en route to the scene. The defendant's attorney also argued that it was reasonable to infer that the caller obviously was a "startled" firsthand witness who was able to respond to the questions asked of her by the dispatcher, that the caller's representations were spontaneous and that the caller was being truthful in her representations. With regard to the last of these inferences, the defendant's attorney argued that "the tone of the call is hurried" and that the caller's statements were "not a prank call" to the police.

The defendant's attorney offered the recording to prove the truth of the matters asserted in the recording, importantly, that Carter was in possession of a weapon at the time of the call. The defendant's attorney argued that this evidence was "critical to the defense claim of self-defense" and that this evidence contradicted Carter's testimony. The defendant's attorney also argued that the recording was admissible under, inter alia, the spontaneous utterance and residual exceptions to the hearsay rule. The prosecutor argued that the recording had not been authenticated. The prosecutor stipulated only to the fact that that recording was of a call made to a 911 dispatcher. The court disallowed the recording on the ground that it had not been authenticated. The court noted that the defendant had not presented evidence concerning either the caller's identity or availability to testify.

"The requirement of authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the offered evidence is what its proponent claims it to be." Conn. Code Evid. § 9-1 (a). "Both courts and commentators have noted that the showing of authenticity is not on a par with the more technical evidentiary rules that govern admissibility, such as hearsay exceptions, competency and

privilege. . . . Rather, there need only be a prima facie showing of authenticity to the court. . . . Once a prima facie showing of authorship is made to the court, the evidence, as long is it is otherwise admissible, goes to the jury, which will ultimately determine its authenticity." (Citations omitted.) *State* v. *Berger*, 249 Conn. 218, 233, 733 A.2d 156 (1999). Of course, once this prima facie showing has been made, the opposing party may present evidence to dispute it. "The test for the admission into evidence of sound recordings is the laying of a proper foundation to assure the authenticity of the recordings." *State* v. *Lorain*, 141 Conn. 694, 700–701, 109 A.2d 504 (1954); see also *Larocque* v. *O'Connor*, 90 Conn. App. 156, 163, 876 A.2d 1229 (2005).

The defendant claims that the parties did not dispute that the recordings were of 911 calls related to the incident and, thus, "[t]here was no problem with the authentication of either 911 [recording]." The defendant also claims that the court should have admitted the recordings on the basis of the evidentiary grounds on which they were offered. The court must look to the purpose for which evidence is offered to determine if a prima facie showing has been made to authenticate the evidence. The defendant did not offer these recordings solely for the purpose of proving that these calls were made to the 911 dispatcher. Instead, the defendant offered the first recording on the ground that it was the 911 call made by Kelly. The defendant offered the recording for the purpose of proving the truth of the matters asserted in the recording and to impeach Kelly's trial testimony. Similarly, the defendant offered the second recording for the purpose of proving the truth of the matters asserted in the recording.

The defendant failed to present any evidence to support a finding that the first recording was what the defendant claimed it to be, namely, the 911 call made

by Kelly. With regard to the second recording, the defendant failed to present any evidence to support a finding that it was what the defendant claimed it to be, namely, a truthful and spontaneous statement concerning the altercation between the defendant and Carter. The defendant argued that it was fair to draw a number of inferences from this second recording, including that the call was made from the apartment building, the call was made by a tenant, the call was made at the time of the incident, the caller's utterances were spontaneous and the caller made truthful statements to the 911 dispatcher. Evidence, not the inferences drawn by the defendant's attorney, was necessary to surmount the evidentiary burden necessary to authenticate this 911 call.[7] Consequently, we agree with the court that the defendant failed to make a proper prima facie showing to authenticate either recording.[8] The court's rulings reflect a proper exercise of its discretion.

### III

The defendant next claims that the evidence did not support a finding that he committed any of the four crimes of which he was convicted.[9] We disagree.

---

[7] Although the parties could have stipulated to the nature of the proffered evidence, the record reflects that the state stipulated only that the recordings were of calls received by the Hartford 911 dispatcher. This stipulation was insufficient to authenticate the recordings for the purposes for which they were offered.

[8] There having been no proper showing relating to the authenticity of this evidence, we need not address the defendant's claims that the court improperly declined to admit it on the grounds for which the evidence was offered.

[9] At the close of the state's case-in-chief, the defendant's attorney moved for a judgment of acquittal. The defendant's attorney raised generally the same issues as are raised in this claim. The court denied the motion, and the defendant's attorney thereafter presented evidence on the defendant's behalf. Although the defendant claims on appeal that the court "improperly denied the motion for a judgment of acquittal," we will treat his claim as it appears in substance, as a challenge to the sufficiency of the evidence. By operation of the so-called "waiver rule," the defendant, having put on evidence on his behalf after the court's denial of his motion for a judgment of acquittal, is not permitted to secure review of the court's denial of the

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Falcon*, 90 Conn. App. 111, 131, 876 A.2d 547, cert. denied, 275 Conn. 926, 883 A.2d 1248 (2005).

In raising these sufficiency of the evidence claims, the defendant has essentially raised a blanket claim, stating that the evidence is insufficient with regard to all four of the crimes of which he stands convicted. The defendant's sufficiency of the evidence claims are poorly briefed in that the defendant has failed to identify the essential elements of the crimes and which elements are at issue. Despite this shortcoming, insofar as our review of the arguments raised permits us to surmise which elements are at issue and which elements are not at issue, we will address in turn the claims raised with regard to each crime.

A

The defendant first argues that the evidence was insufficient to convict him of the burglary charges. To convict the defendant of burglary in the first degree in violation of § 53a-101 (a) (1), as charged, the state had to prove beyond a reasonable doubt that the defendant (1) entered or remained unlawfully in a building, (2) intended to commit a crime therein and (3) was armed with a dangerous instrument. General Statutes § 53a-101 (a) (1). To convict the defendant of burglary in the first degree in violation of § 53a-101 (a) (2), as charged,

motion, and we will review the sufficiency of the evidence by examining the evidence presented in toto. See *State* v. *Perkins*, 271 Conn. 218, 856 A.2d 917 (2004).

the state had to prove the first two elements set forth previously, as well as prove that the defendant, in the course of committing the crime, intentionally, knowingly or recklessly inflicted bodily injury on another person.[10] General Statutes § 53a-101 (a) (2).

Carter and Kelly testified that the laundry room was behind locked doors, in an area of the building not open to the general public. Carter and Kelly testified that tenants possessed keys to gain entry into the laundry room. Carter, the building's general caretaker, testified that the defendant was not a tenant, and there was no evidence to the contrary.

Carter also testified that he had observed the defendant in the building on more than one occasion prior to the incident at issue. According to Carter, on one of these occasions, three months before the incident at issue, he encountered the defendant in the laundry room. Carter asked the defendant what he was doing there. The defendant replied that he was staying with a tenant, his aunt. Carter testified that he asked the defendant what apartment his aunt lived in, and the defendant replied that he did not remember. Carter then asked the defendant to show him where his aunt lived. The defendant replied that his aunt was not at home. Carter informed the defendant that he would wait for her in the lobby. As Carter and the defendant reached the lobby, the defendant ran out of the building. Carter told the defendant that he would "catch" him again.

Carter also testified that, when he encountered the defendant in the laundry room on April 17, 2003, he observed the defendant standing near a laundry machine. The defendant moved toward Carter and, as Carter positioned himself so as to prevent the defendant

---

[10] The defendant does not claim that the evidence did not permit the jury to reasonably find that, in the course of committing a crime, he intentionally, knowingly or recklessly inflicted bodily injury on Carter.

from leaving the laundry room, the defendant hit him in the head with a crowbar. Carter testified that the defendant "hit [him] first." Carter testified that, during his ensuing physical altercation with the defendant, which began in the building, the defendant tried to stab him with a screwdriver. Carter also testified that the defendant possessed a Sheetrock knife. Carter testified that, when he and police officers returned to the laundry room after the incident, he observed marks indicating that someone had attempted to pry open the laundry machines, in the area where coins are inserted. Kelly also testified that she observed these pry marks on the laundry machines. Kelly testified that these marks were not present prior to April 17, 2003. St. John testified that, when he examined the laundry machines upon his arrival at the scene, he observed "fresh pry marks, with paint and metal chips, on two of the machines." St. John and Salkeld testified that a crowbar, a screwdriver and a pair of pliers were recovered from the scene.

The defendant first argues that the evidence did not permit a finding that he entered or remained unlawfully in the building because Carter testified that the defendant once told him that his aunt lived in the building. The defendant also argues that there was "no evidence of forced entry into the building." These arguments are unavailing. The evidence permitted a finding that the defendant was neither a tenant nor that he had a lawful reason to enter or remain in the apartment building. On the basis of Carter's testimony concerning his interaction with the defendant in the apartment building prior to this incident, as well as Carter's testimony concerning the defendant's conduct on the night of April 17, 2003, it was not unreasonable for the jury to find that the defendant entered or remained unlawfully in the building and, specifically, the locked laundry room. Section 53a-101 (a) does not require the state to prove that the defendant forcibly entered the building.

The defendant also argues that there was no evidence that he entered or remained unlawfully in the building with the intent to commit a crime therein. The defendant states that "[n]o stolen property was taken from [him]." This claim is without merit. Section 53a-101 (a) does not require the state to prove that the defendant was in possession of stolen property. The evidence provided an ample basis on which the jury could have found that the defendant entered or remained unlawfully in the building with the intent to steal money from the laundry machines. That Carter's discovery of the defendant precluded him from achieving the benefit of his criminal acts does not affect our analysis with regard to this issue.

With regard to his conviction under § 53a-101 (a) (1), the defendant argues that there was no evidence that he possessed a dangerous instrument inside the building. The defendant relies on evidence that the police found a crowbar, a screwdriver and a Sheetrock knife outside, rather than inside, of the building. The defendant also relies on the fact that Kelly testified that she observed these instruments outside of the building. We reject the defendant's claim because there was evidence, in the form of Carter's testimony, that the defendant was armed with, among other instruments, a crowbar, while inside of the building. The defendant does not argue that the crowbar was not a dangerous instrument. The fact that the evidence permitted a finding that the crowbar and other instruments were later recovered outside of the building is of no consequence to our analysis.

B

To convict the defendant of assault in the second degree in violation of § 53a-60 (a) (2), as charged, the state had to prove that the defendant (1) intended to cause physical injury to another person and (2) caused

physical injury to such person by means of a dangerous instrument other than by means of the discharge of a firearm. General Statutes § 53a-60 (a) (2).

We previously have set forth the version of events provided by Carter. The defendant does not dispute that the evidence permitted a finding that he caused physical injury to Carter by striking him in the head with a crowbar or that a crowbar is a dangerous instrument. The evidence was undisputed that Carter suffered a head injury that caused bleeding and required medical attention. The defendant's claim is related to the element of intent. The defendant claims that "the evidence suggested that all [he] was doing throughout his confrontation with Mr. Carter was attempting to escape from Mr. Carter" and that all of his actions were taken in self-defense. The defendant so argued at trial. The defendant also argues that several witnesses testified that, when they observed him on the small lawn in front of the apartment building, he was being restrained.

"Where . . . factual issues exist that are related to a defendant's intent, we recognize that such factual issues are characteristically proven by circumstantial evidence. . . . It is obvious that direct evidence of the accused's state of mind is rarely available and, therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Internal quotation marks omitted.) *State* v. *McCoy*, 91 Conn. App. 1, 7, 879 A.2d 534, cert. denied, 276 Conn. 904, 884 A.2d 1026 (2005).

On the basis of the evidence and the rational inferences drawn therefrom, the jury reasonably found that the defendant had not acted in self-defense but with the intent to cause physical injury to Carter. The jury was free to accept or reject, in whole or in part, Carter's testimony. On the basis of that testimony, the jury could

have found that the defendant did not perceive any threat from Carter who, while unarmed, merely asked the defendant what he was doing in the laundry room. The jury could have found that the defendant, who was in the act of committing burglary at the time Carter encountered him, was an initial aggressor who used force to disable Carter so as to accomplish a criminal end or to flee the scene of his crime. Accordingly, this claim fails.

## C

To convict the defendant of interfering with an officer in violation of § 53a-167a, as charged, the state had to prove beyond a reasonable doubt that the defendant obstructed, resisted, hindered or endangered any peace officer in the performance of his duties. General Statutes § 53a-167a.

Salkeld testified that, when he and other officers at the scene attempted to place the defendant under arrest, the defendant became "very irate." Salkeld recalled that the defendant disobeyed the officers' commands to put his hands behind his back and, later, to get inside of a police cruiser. Salkeld recalled: "We said that you are under arrest. Give us your hands, grabbed one of his hands. He refused to comply. So, we had to put his hands behind his back several times. He continued to refuse. When we got him handcuffed, we tried to get him into the [police] vehicle. He would not get back into the vehicle. He did not want to get inside the cruiser." Salkeld testified that the defendant "stared" at the officers and that eventually, after repeated reprimands by the officers, the defendant complied with their request to get into the cruiser. St. John generally corroborated Salkeld's version of events in this regard. St. John testified that the defendant used profanity and yelled and screamed at the time of his arrest. The defendant did not obey the officers' commands. St. John

testified that the defendant physically struggled with the officers at the time of his arrest, that the officers had to hold his arms so as to place handcuffs on him. St. John also testified that the defendant behaved in a hostile manner, that the defendant threatened "to sue" the officers and that the officers had to "force" the defendant to get into the police cruiser.

The defendant argues that, at the time of his arrest, he had been restrained by more than one person and that "[a]ny failure to cooperate with the police was minimal and the reasonable response of someone who had just been attacked." The defendant seems to argue that, although he engaged in the type of behavior prohibited by the statute, he did not act with the mental state required for the commission of the crime.

"This court has stated that General Statutes § 53a-167a . . . defines interfering to include obstruction, resistance, hindrance or endangerment. . . . By using those words it is apparent that the legislature intended to prohibit any act which would amount to meddling in or hampering the activities of the police in the performance of their duties. . . . In enacting [that section], the legislature sought to prohibit behavior that hampers the activities of the police in the performance of their duties. . . . The statute's purpose is to ensure orderly compliance with the police during the performance of their duties; any act intended to thwart this purpose violates the statute. . . . Although the statute does not contain a specific intent element, we previously have construed the requisite mental state to include an intent to interfere with an officer by resisting arrest." (Citation omitted; internal quotation marks omitted.) *State* v. *Porter*, 76 Conn. App. 477, 491–92, 819 A.2d 909, cert. denied, 264 Conn. 910, 826 A.2d 181 (2003).

As the defendant apparently recognizes, the evidence permitted a finding that he disobeyed and physically

struggled with the officers as they arrested him. This conduct unquestionably hindered the officers in the performance of their duties; the defendant resisted arrest. The defendant's repeated acts of disobedience, which included struggling with and shouting at police, permitted an inference that the defendant acted deliberately, intending to resist arrest. Accordingly, this claim is not persuasive.

## IV

Last, the defendant claims that the court improperly relied on an inaccurate presentence investigation report at the time of sentencing. We disagree.

At the sentencing hearing, the prosecutor and the defendant's attorney addressed the court. The defendant's attorney referred to the report that had been prepared but did not dispute the accuracy of its contents. The defendant thereafter addressed the court personally and characterized the report as inaccurate and biased against him. The defendant complained that the report referred to some convictions for crimes that had been committed more than ten years ago. The defendant stated that the report inaccurately reflected sentences he received for convictions in Ohio. The defendant also claimed that the report did not accurately reflect his employment history because it omitted reference to certain periods of employment. Further, the defendant disputed statements in the report concerning his history of drug use. The probation officer who interviewed the defendant and prepared the report noted that the defendant had stated that, at the time of the crime, he had a $200 a day crack cocaine habit. The defendant vehemently denied that he made such a representation.

Our rules of practice require the trial court to order a presentence investigation in cases in which a defendant "is convicted of a crime other than a capital felony, the punishment for which may include imprisonment

for more than one year . . . ." Practice Book § 43-3 (a). The scope of the investigation, as well as the use of the report generated thereby, is likewise governed by our rules of practice, which envision that the court will rely on the report during the sentencing process. *Barese* v. *Clark*, 62 Conn. App. 58, 66–67, 773 A.2d 946 (2001); Practice Book § 43-4 et seq. "The sole purpose [of a presentence investigation report] is to enable the court, within the limits fixed by statute, to impose an appropriate penalty, fitting the offender as well as the crime. . . . The primary value of a [presentence investigation report] stems from the information contained therein, not from the report itself. Most of this information can be brought to the trial court's attention by either party by means other than a [presentence investigation report]." (Citation omitted; internal quotation marks omitted.) *State* v. *Patterson*, 236 Conn. 561, 574–75, 674 A.2d 416 (1996).

The defendant claims that the report contained the alleged inaccuracies that he brought to the court's attention at the time of sentencing. The defendant also claims that the court "relied on some of these inaccuracies when it sentenced the defendant." Apparently, the defendant relies on his representations at the sentencing hearing in support of the former claim. The defendant has not provided any support for the latter claim. The defendant does not claim that his sentence is excessive or that it should be set aside; the defendant does not state what relief he seeks with regard to this claim. The record reflects that, at the time of sentencing, the court's central concern was the defendant's criminal actions on the night of April 17, 2003, and, particularly, his infliction of a serious head injury on Carter. The court stated to the defendant: "This was a strong case. You were caught red-handed." The court noted that Carter's acts of "bravery" in preventing the defendant's escape stood in contrast to the defendant's repeated

denials that he did anything wrong. The court noted that the defendant had a history of convictions for burglary and larceny and that, on the basis of the defendant's representations to the probation officer who prepared the report, the defendant's criminal conduct was likely tied to his use of illegal drugs.

"[I]f a sentence is within statutory limits it is not generally subject to modification by a reviewing court. . . . A sentencing judge has very broad discretion in imposing any sentence within the statutory limits . . . . The court may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information [it] may consider or the source from which it may come. . . . Due process requires, however, that information be considered only if it has some minimum indicium of reliability. . . . A court should refrain from comments that find no basis in the record. Nonetheless, the mere reference to information outside of the record does not require a sentence to be set aside unless the defendant shows: (1) that the information was materially false or unreliable; and (2) that the trial court substantially relied on the information in determining the sentence." (Citations omitted; internal quotation marks omitted.) *State* v. *Collette*, 199 Conn. 308, 320–21, 507 A.2d 99 (1986).

The record reflects that the court afforded the defendant an opportunity to bring any relevant information to the court's attention and to dispute any of the information contained in the report. The fact that the defendant availed himself of this opportunity is significant. Cf. *State* v. *Miller*, 56 Conn. App. 191, 203, 742 A.2d 402 (1999), cert. denied, 252 Conn. 937, 747 A.2d 4 (2000). The court considered the report at the time of sentencing and, to the extent that the defendant disputed the information in the report, the court had the opportunity to consider the defendant's denials and clarifications of such information. Certainly, the court was not

obliged to accept as true the defendant's representations. The defendant has not demonstrated that the court in fact based its sentence on any allegedly inaccurate information in the report. Further, "[t]hat the [report] may have contained some inaccuracies was cured by the defendant's denials and clarifications of the facts included." *State* v. *Connelly*, 46 Conn. App. 486, 505, 700 A.2d 694 (1997), cert. denied, 244 Conn. 907, 908, 713 A.2d 829, cert. denied, 525 U.S. 907, 119 S. Ct. 245, 142 L. Ed. 2d 210 (1998).

The judgment is affirmed.

In this opinion the other judges concurred.