STATE OF CONNECTICUT *v.* SCOTT D. SWAIN
(AC 26398)

DiPentima, Gruendel and Harper, Js.

Argued November 29, 2006—officially released May 22, 2007

*Charles F. Willson*, special public defender, for the appellant (defendant).

*Bruce R. Lockwood*, assistant state's attorney, with whom, on the brief, were *Patricia M. Froehlich*, state's attorney, *Mark A. Stabile*, supervisory assistant state's attorney, and *Thomas M. DeLillo*, assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Scott D. Swain, appeals from the judgments of conviction, rendered following

a jury trial, of two counts of aggravated sexual assault in the first degree in violation of General Statutes § 53a-70a (a) (1), two counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), two counts of kidnapping in the first degree in violation of General Statutes § 53a-92 and two counts of threatening in the second degree in violation of General Statutes § 53a-62.[1] The defendant claims that (1) the trial court improperly denied his motion to sever the two cases that were joined for trial, (2) the court improperly excluded certain impeachment evidence and (3) prosecutorial misconduct deprived him of a fair trial. We affirm the judgments of the trial court.

The jury reasonably could have found the following facts. On August 5, 2001, B[2] was staying at the residence of a friend in Willimantic. B was a heroin addict who earned money by means of prostitution. At approximately 3:45 a.m., she left her friend's residence to purchase heroin. While she was walking along Main Street, the defendant drove by her several times in his automobile. The defendant ultimately stopped his automobile, conversed with B and asked her to get into his automobile. B recognized the defendant as someone who, on several prior occasions, had paid her to perform oral sex. One such occasion had occurred as recently as eight months prior to this encounter. B got into the defendant's automobile, and the defendant drove B away from Main Street.

The defendant agreed to pay B $60, and B agreed to perform oral sex and to permit the defendant to engage in vaginal intercourse with her. The defendant drove to

---

[1] The court sentenced the defendant to a total effective term of incarceration of fifty years.

[2] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

a desolate, wooded area in Windham, off Old Mansfield Road, and parked his automobile. The defendant and B got out of the automobile, and B began to perform oral sex on the defendant. The defendant asked B to stop, grabbed her by the hair with his left hand and held a knife against her neck with his right hand. The defendant instructed B to do as he said, threatening to stab her if she did not.

The defendant ordered B to undress and, while she resisted, attempted to engage in anal intercourse with her. Ultimately, the defendant forced B to her knees and instructed her to perform oral sex. Following the sexual assault, the defendant told B to get dressed and to walk into the wooded area, threatening to kill her if she looked back. The defendant drove away. B eventually walked to a traveled roadway, where a bystander provided assistance and took B to the workplace of one of B's friends in Willimantic. The bystander later reported the incident to the police and, while a police officer was in the process of investigating the reported incident later that morning, B approached him and related what had occurred.

Less than one year later, on July 16, 2002, P, a heroin addict who engaged in prostitution, left her Willimantic residence at approximately 2 a.m. to earn money to purchase heroin. P walked toward Main Street in Willimantic. The defendant approached P in his automobile and inquired if she was working as a prostitute. P responded affirmatively and got into the defendant's automobile. The defendant inquired how much P would charge him for specific sexual acts, but the parties did not reach an agreement in this regard.

The defendant drove P to approximately the same area off Old Mansfield Road in Windham where he had sexually assaulted B. Soon after he parked his automobile in a wooded clearing, the defendant forced P to

perform oral sex. He grabbed her hair and told her he was armed with a knife and a gun. He also showed her a gun. At one point, he held a knife against her back and threatened to stab her. Later, he struck P's head, partially undressed her and, by means of his fingers or a gun, vaginally penetrated P. After he completed his sexual act, the defendant forcibly removed P from the automobile, pulling her by her hair. The defendant walked P into the wooded area, instructed her to start running and not to look back. The defendant drove away. P made her way out of the wooded area and walked to a residence where she asked for help. Police responded to the scene and assisted P in obtaining medical care. Additional facts related to the incidents will be set forth as necessary.

I

The defendant first claims that the court improperly denied his motion to sever the two cases that were joined for trial. We disagree.

The record reflects that in December, 2003, the state filed a motion for joinder, requesting that the court join for trial four pending cases against the defendant. The first case concerned the defendant's conduct on August 5, 2001, against B. The second case concerned the defendant's conduct in June, 2002. In this second case, the state alleged that the defendant, while accompanied by another individual, sexually assaulted a female victim in Chaplin. The third case concerned the defendant's conduct on July 16, 2002, against P. The fourth case concerned the defendant's failure to register as a sex offender in this state following an unrelated Massachusetts conviction. In May, 2004, the defendant filed a motion to sever these four cases. The court held a hearing on the defendant's motion and, in an oral ruling, granted the defendant's motion in part, severing the

second and fourth cases from trial.[3] The court denied the motion in part, joining the first and third cases described previously. The defendant claims that the court's ruling deprived him of his right to a fair trial under the federal and state constitutions.[4]

The standard of review and legal principles that govern this type of claim were recently set forth by this court: "In Connecticut, joinder of cases is favored. . . . Joinder expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice both time and money to serve upon juries, and avoids the necessity of recalling witnesses who would otherwise be called upon to testify only once. . . .

"Despite this deferential standard, the court's discretion regarding joinder, however, is not unlimited; rather, that discretion must be exercised in a manner consistent with the defendant's right to a fair trial. . . . [Our Supreme Court has recognized] that an improper joinder may expose a defendant to potential prejudice for three reasons. First, when several charges have been made against the defendant, the jury may consider that a person charged with doing so many things is a bad [person] who must have done something, and may cumulate evidence against him . . . . Second, the jury may have used the evidence of one case to convict the defendant in another case even though that evidence would have been inadmissible at a separate trial. . . . [Third] joinder of cases that are factually similar but legally unconnected . . . present[s] the . . . danger that a defendant will be subjected to the omnipresent

---

[3] At the time of argument on the motion, both parties agreed that the court should sever the fourth case.

[4] As the defendant has not analyzed his claim separately under the Connecticut constitution, we will address his claim solely under the federal constitution. See *State* v. *Peay*, 96 Conn. App. 421, 425 n.3, 900 A.2d 577, cert. denied, 280 Conn. 909, 908 A.2d 541 (2006).

risk . . . that although so much [of the evidence] as would be admissible upon any one of the charges might not [persuade the jury] of the accused's guilt, the sum of it will convince them as to all. . . .

"General Statutes § 54-57 and Practice Book § 829 [now § 41-19] expressly authorize a trial court to order a defendant to be tried jointly on charges arising separately. In deciding whether to sever informations joined for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate court may not disturb. . . . *The defendant bears a heavy burden of showing that the denial of severance resulted in substantial injustice and that any resulting prejudice was beyond the curative power of the court's instructions.* . . . [W]hether a joint trial will be substantially prejudicial to the rights of the defendant . . . means something more than that a joint trial will be less advantageous to the defendant. . . .

"Furthermore, we have identified several factors that a trial court should consider. . . . These factors include: (1) whether the charges involve discrete, easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial. . . . If any or all of these factors are present, a reviewing court must decide whether the trial court's jury instructions cured any prejudice that might have occurred." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Davis*, 98 Conn. App. 608, 615–16, 911 A.2d 753 (2006), cert. granted on other grounds, 281 Conn. 915, 917 A.2d 999 (2007).

In its oral ruling, the court considered each of the factors described previously. The court reasoned that because the cases to be joined shared "extremely similar" factual allegations, evidence admissible during one

case would be admissible during the other. The court stated that, this being the case, "[s]eparate trials would provide the defendant no significant benefit." The court, however, noted that the factual scenarios in these cases were nonetheless "discrete" and "easily distinguishable . . . ." The court also stated that although allegations of brutal conduct were at issue in both cases, "the risk that one of the cases will so shock the jurors that they would convict the defendant on the other case is de minimis and does not warrant a severance." Finally, the court stated that it did not anticipate a "long or overly complex trial" and expressed its confidence that the jurors would be able to distinguish between the two factual scenarios presented in these two cases.

In its instructions, the court stated: "Now, you're trying separate cases. There's a case where [P is] the alleged victim and a case where [B] is the alleged victim. Ordinarily, we tell juries not to consider either of the cases in evaluating the other case. In this case, however, there is one limited purpose that [you] may consider the cases for—that you may consider the evidence in one case in the other case, and that is for you to determine that there are sufficient similarities in the cases that constitute a common scheme or plan [for] committing sexual assaults. It may not be considered by you, however, to determine that the defendant has a propensity to commit criminal acts or that he's in general a bad person; you may not use the evidence in one case in the other case for that purpose. You may use it if you find that the evidence logically and rationally demonstrates a common scheme in the commission of sexual assaults, you may use the evidence in one case in considering whether the state has met its burden of proof in the other."

The defendant appears to suggest that courts should disfavor joining cases for trial because it is almost always inherently prejudicial. The defendant argues

that severance of the cases at issue was necessary for several reasons. First, the defendant argues that "other than as to the identity of the victims, the charges were identical." The defendant argues that "[b]oth of the alleged victims shared several traits and characteristics" and that "[t]here were similarities to the alleged events." According to the defendant, "[t]he prejudice to [him] is obvious—the jury was able to use evidence of one crime to convict [him] of the other." Second, the defendant argues that the allegations of his conduct against P "were escalated in brutality and more shocking in nature" than the allegations of his conduct against B. Thus, the defendant argues, "it [was] impossible for the jury to treat the cases separately." Third, the defendant argues that the court improperly permitted the jury to rely on the similarities inherent in the cases to find him guilty, instructing the jury that it could consider the evidence in both cases when reaching a verdict on either case. The defendant posits that "the evidence [was] too prejudicial to encourage inferences of a common scheme or plan" and that "signature crimes were not involved" in the cases.

We conclude that the court conducted a proper analysis and reasonably exercised its discretion by ruling that joining these cases was proper. The defendant's challenges to the court's evaluation of the relevant factors are not persuasive. First, it is of little relevance to our analysis that the state alleged that the same four charges arose from each of the two factual scenarios at issue. What is relevant is whether the factual allegations underlying these crimes were easily distinguishable. The court reasonably concluded that the factual scenarios were easily distinguishable. Each scenario not only occurred nearly one year apart but involved a different victim. In consideration of these facts, we are not persuaded that it was at all likely that the jury would have had difficulty distinguishing the incidents or evaluating each incident separately. We also note that the state

presented in a separate manner evidence concerning each incident and victim, the parties referred to the evidence concerning each incident in a logical and separate manner during argument, and the court clearly distinguished between the two separate incidents and victims in its charge. "A trial court will not have manifestly abused its discretion in denying severance if the state's orderly presentation of evidence has prevented confusion of the jury and has enabled the jury to consider the evidence relevant to each charge separately and distinctly." *State* v. *Pollitt*, 205 Conn. 61, 68, 530 A.2d 155 (1987).[5]

---

[5] We do not suggest, however, that the cases, while readily distinguishable, did not share factual similarities. Indeed, the significant factual similarities shared by the cases are considerable and, as the court recognized, weighed heavily in favor of joinder. We note that an alternate basis for upholding a court's decision to consolidate cases is whether evidence in the cases would be cross admissible. "Where evidence of one incident *can* be admitted at the trial of the other, separate trials would provide the defendant no significant benefit. It is clear that, under such circumstances, the defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial." (Emphasis in original.) *State* v. *Pollitt*, supra, 205 Conn. 68.

Here, the court found that the evidence in both cases permitted a finding of a pattern of criminal conduct by the defendant and that that evidence would be cross admissible. We agree. The allegations and evidence reflected a pattern of conduct in both cases in that the defendant approached the victims near Main Street in Willimantic, approached the victims in the early morning hours, approached the victims while driving in an automobile, the victims were female, drug addicts and prostitutes, the defendant drove both victims away from the area where he encountered them, drove both victims to a wooded area located off Old Mansfield Road in Windham, forced both victims to perform oral sex, used a knife to threaten the victim in each incident and ordered both victims either to walk or run into the wooded area after he completed his sexual assault. Also, both incidents occurred within one year of one another.

Contrary to the defendant's view of this evidence, the pattern and characteristics of these crimes were very similar and reflected a distinctive common scheme; they did not merely reflect crimes of the same general nature. Because evidence relating to each incident would have been cross admissible in separate trials to prove a common plan or scheme, we conclude that the court properly joined the cases under the alternate cross admissibility theory of *Pollitt*. See *State* v. *Carty*, 100 Conn. App. 40, 44, 45 n.5 and 48 n.7, 916 A.2d 852 (trial court could properly have joined cases under either factors in *State* v. *Boscarino*, 204 Conn. 714, 722–24, 529 A.2d 1260 [1987], or under

Second, we agree with the court that the brutality of the separate crimes did not weigh in favor of severing the cases. The sexual assault crimes that occurred in the present case are brutal and appalling. The relevant inquiry is whether there was a significant disparity in the degree of brutality that was reflected by the evidence in each case. "Sexual assault cases should be severed only where one of the sexual assault crimes with which the defendant is charged is so brutal and shocking when compared with the other[s], that a jury, even with proper instructions, could not treat them separately." (Internal quotation marks omitted.) *State* v. *David P.*, 70 Conn. App. 462, 471, 800 A.2d 541, cert. denied, 262 Conn. 907, 810 A.2d 275 (2002). We agree with the court that both cases, while distinguishable, reflected relatively similar degrees of violence and brutality. We disagree with the defendant that the brutal allegations or evidence in the case involving P made it impossible for the jury to consider independently the charges in the case involving B.

Finally, although the defendant did not address this relevant consideration, the trial was neither exceptionally long nor did it involve notably complex issues. The evidentiary phase of the trial lasted three days and involved only two incidents. These facts do not help the defendant's claim. See, e.g., *State* v. *Hair*, 68 Conn. App. 695, 701, 792 A.2d 179 (concluding that five day trial involving two charges not unduly long or complex that severance warranted), cert. denied, 260 Conn. 925, 797 A.2d 522 (2002); *State* v. *Banks*, 59 Conn. App. 112, 124, 755 A.2d 951 (concluding that six day trial involving two incidents not so long or complex that jury was confused), cert. denied, 254 Conn. 950, 762 A.2d 904 (2000); *State* v. *Stevenson*, 43 Conn. App. 680, 689, 686 A.2d 500 (1996) (concluding that six day trial involving

theory that evidence from each case would be cross admissible), cert. denied, 282 Conn. 917, 925 A.2d 1100 (2007).

two incidents not unnecessarily long, complex), cert. denied, 240 Conn. 920, 692 A.2d 817 (1997); *State* v. *Snead*, 41 Conn. App. 584, 588, 677 A.2d 446 (1996) (concluding that two day trial involving ten witnesses and six exhibits not so long, complex that severance warranted).

We conclude that the court did not abuse its discretion in denying severance. Furthermore, even if we were to conclude that any of the relevant factors weighed in favor of severance, we nonetheless conclude that the court's detailed instructions to the jury cured any prejudice that might have been caused by the court's ruling. As set forth previously, the court unambiguously instructed the jury that it was not to consider the evidence in either case for an improper purpose. Further, the court instructed the jury that it was to consider separately the evidence presented for each charge in each case. Under these circumstances, we conclude that the defendant has not surmounted the considerable burden of demonstrating that the denial of severance resulted in substantial injustice or that any prejudice caused by the court's ruling was beyond the curative power of the court's proper instructions to the jury.

## II

The defendant next claims that the court improperly excluded certain impeachment evidence. We disagree.

"Unless an evidentiary ruling involves a clear misconception of the law, [t]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling . . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice

or injustice." (Internal quotation marks omitted.) *State* v. *Smith*, 275 Conn. 205, 219, 881 A.2d 160 (2005).

## A

Following B's direct examination, the state asked the court to restrict the defendant's cross-examination of B with regard to her prior felony convictions. Outside the presence of the jury, the state represented to the court that B had been convicted of three felony crimes. Specifically, in August, 1994, B was convicted of possession of narcotics. The state represented that the court had imposed a two year suspended sentence and two years of probation. In April, 2002, B was convicted of manslaughter in the second degree and possession of narcotics. The defendant's attorney represented that he wanted to ask B "if she has ever been convicted of a felony and what she has been convicted of." Arguing that the 1994 conviction was too remote in time, the state asked the court to preclude the defendant from asking any questions concerning that conviction during cross-examination. With regard to the 2002 conviction, the state argued that the crimes involved were not probative of B's truthfulness and asked the court to preclude the defendant from inquiring into the nature of those crimes.

The court ruled that the defendant could impeach the witness by inquiring whether she had "been convicted of two felonies." The court noted that the 1994 conviction was a "ten year felony." See Conn. Code Evid. § 6-7 (a), commentary. The court also explained that evidence concerning the manslaughter conviction could distract the jury from the issues in the case because the mention of the name of the crime could stir the emotions of the jury and because the jury would likely engage in speculation about the crime itself. The court noted that it would not allow the 2002 narcotics conviction to be named as well because if it permitted

the defendant to elicit the name of that conviction and not the manslaughter conviction, "it will draw attention to the fact that one [conviction] is named and one is not named."

The defendant claims that the court improperly precluded him from inquiring into the 1994 narcotics conviction as a named felony. The defendant argues that the conviction was not too remote to be probative and that any potential prejudice to B by admitting the evidence was negligible. Further, the defendant argues that the conviction bore on B's truthfulness because it would have been evidence that "her memory and ability to recall may be hampered by a lifetime of drug use." The defendant argues that B's identification of him as the perpetrator was critical evidence and that during her testimony, B had minimized the extent of her drug use prior to 2001. The defendant argues that it was highly detrimental to his case that the court prevented him from impeaching B's testimony by means of this excluded evidence.

"For the purpose of impeaching the credibility of a witness, evidence that a witness has been convicted of a crime is admissible if the crime was punishable by imprisonment for more than one year. In determining whether to admit evidence of a conviction, the court shall consider: (1) The extent of the prejudice likely to arise, (2) the significance of the particular crime in indicating untruthfulness, and (3) the remoteness in time of the conviction." Conn. Code Evid. § 6-7 (a). Here, the court appears to have been motivated in its ruling by the remoteness of the August, 1994 conviction, as the court noted that it was a "ten year felony." See Conn. Code Evid. § 6-7 (a), commentary. Our Supreme Court has stated: "With respect to the remoteness prong of the balancing test, we have endorsed a general guideline of ten years from conviction or release from confinement for that conviction, whichever is later, as an

appropriate limitation on the use of a witness' prior conviction. . . . [T]he ten year benchmark . . . [however] is not an absolute bar to the use of a conviction that is more than ten years old, but, rather, serves merely as a guide to assist the trial judge in evaluating the conviction's remoteness. . . . We have recognized, moreover, that convictions having some special significance upon the issue of veracity surmount the standard bar of ten years and qualify for the balancing of probative value against prejudice." (Citations omitted; internal quotation marks omitted.) *State* v. *Skakel*, 276 Conn. 633, 738–39, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006).

Clearly, the court acted within its discretion in deeming the conviction to be too remote. The conviction from August, 1994, predated B's August 17, 2004 trial testimony by ten years. The state represented that B had received a suspended sentence and a period of probation following the conviction; thus, the record does not reflect that she was confined as a result of that conviction. Hence, under the guidance of the so-called "ten year rule," the conviction was presumptively remote. Further, we are not persuaded by the defendant's argument that it was especially probative of truthfulness such that its character otherwise weighed in favor of admissibility. "[C]rimes involving larcenous intent imply a general disposition toward dishonesty or a tendency to make false statements. . . . [I]n common human experience acts of deceit, fraud, cheating, or stealing . . . are universally regarded as conduct which reflects on a [person's] honesty and integrity . . . ." (Internal quotation marks omitted.) *State* v. *Erhardt*, 90 Conn. App. 853, 868, 879 A.2d 561, cert. denied, 276 Conn. 906, 884 A.2d 1028 (2005). Although a felony narcotics conviction reflects poorly on the character of any witness, we do not conclude that it was uncommonly probative in demonstrating that B

was untruthful. Finally, we are mindful that B testified that she had a "heroin habit" when she attended high school and that she was addicted to heroin and cocaine at the time of the incident at issue, in August, 2001. Also, the court permitted the defendant to elicit testimony that B had been convicted of two felony crimes. Accordingly, the precluded inquiry would have elicited evidence that was, in consideration of its likely effect on the jury, cumulative. The court's ruling reflects a sound exercise of its discretion, and the defendant has not demonstrated that the ruling caused him to suffer substantial prejudice or injustice.

## B

After the court ruled on the admissibility of evidence of B's felony convictions, the defendant's attorney indicated that he wanted to question B about the fact that she was incarcerated both at the time that she identified the defendant by means of a photographic array and at the time of trial. The defendant stressed that he wanted to so inquire for the purpose of showing that B's identification or her testimony was the result of "some type of deal [or] some type of arrangement" with the state. The state argued that the prejudicial effect of B's incarceration was far more prejudicial than probative of whether she had made any type of deal with the state. The court ruled that if the defendant wanted to ask B whether the state had made any deals with her in exchange for her cooperation in the case, it could do so directly and could not inquire into her incarceration.

The defendant argues that the court improperly restricted him from asking B about her incarceration because evidence that B was incarcerated tended to demonstrate that B was biased in favor of the state and that she had an interest in helping the state prove its case against him. The defendant properly argues that he

was entitled to elicit evidence of bias. "The credibility of a witness may be impeached by evidence showing bias for, prejudice against, or interest in any person or matter that might cause the witness to testify falsely." Conn. Code Evid. § 6-5. However, "[r]elevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice . . . ." Conn. Code Evid. § 4-3.

Certainly, the fact that B was incarcerated might be expected to cause a negative reaction in the eyes of the jury.[6] It is not difficult to presume that such negative feeling could *unduly* prejudice a witness. It is clear from the statements of the defendant's attorney that he was interested in presenting evidence from which the jury might find that B, by virtue of her felony convictions and incarceration, had an interest in helping the state with its case. The court permitted the defendant to elicit testimony from B that she had been convicted of two felonies and to inquire as to whether the state made any promises to her with regard to her sentence for those convictions. We are satisfied that the court provided the defendant a means by which he could cross-examine B to elicit evidence of bias. The ruling reflects a sound exercise of discretion. Furthermore, we conclude that the defendant has not demonstrated that the court's ruling caused him substantial prejudice or injustice.

C

During her direct testimony, B recalled that she encountered Joseph Yarchak, a Willimantic police officer, as she was walking along Main Street in Willimantic

---

[6] Practice Book § 44-7 provides in relevant part: "An . . . incarcerated witness shall not be required during the course of a trial to appear in court in the distinctive attire of a prisoner or convict." "In the minds of the jurors the credibility of [incarcerated] witnesses can be affected in the same manner as the presumption of innocence can be diminished by the defendant's appearance in prison garb." *State* v. *Yates*, 174 Conn. 16, 19, 381 A.2d 536 (1977). Similarly, inquiry into the fact that a witness is incarcerated might reasonably be expected, to an unfair degree, to hamper a fair evaluation of such witness' credibility.

on the morning after the assault. B testified that at the time, Yarchak was responding to the report of the bystander who had assisted her and drove her back to Willimantic. B testified that she had known Yarchak "from being around Willimantic." During cross-examination, the defendant's attorney inquired of B: "You mentioned that you knew Officer Yarchak of Willimantic; how did you know him?" Before B responded, the court stated: "No." The defendant's attorney stated, "I'll withdraw the question," and moved on to other areas of inquiry.

The defendant claims that the excluded area of inquiry was a "fertile" ground for cross-examination, positing that examination with regard to this area could have exposed B's bias in favor of the state and her motive to help the state "secure its case." Notwithstanding the fact that the defendant does not explain these assertions, we recognize that the defendant's evidentiary claim is unpreserved.

"Practice Book § 60-5 provides in relevant part that [this] court shall not be bound to consider a claim unless it was distinctly raised at the trial . . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . Our rules of practice make it clear that counsel must object to a ruling of evidence [and] state the grounds upon which objection is made . . . to preserve the grounds for appeal. . . . These requirements are not simply formalities. . . . We consistently have stated that we will not consider evidentiary rulings where counsel did not properly preserve a claim of error by objection . . . ." (Internal quotation marks omitted.) *State* v. *Smith*, 91 Conn. App. 133, 137, 880 A.2d 959, cert. denied, 276 Conn. 917, 888 A.2d 86 (2005). The court curtly expressed its disfavor with the question posed by the defendant's attorney. Rather than claiming the question on a ground of admissibility, the defendant's attorney withdrew it and did not pursue

the matter. This conduct leaves us to conclude that the defendant's attorney either agreed that the inquiry was improper or that he chose not to articulate a basis in law for the inquiry. Regardless of which of these circumstances occurred, the defendant has not preserved this claim of error for our review.

## III

Finally, the defendant claims that the prosecutor engaged in prosecutorial misconduct during closing argument that deprived him of a fair trial.[7] We disagree.

We analyze the defendant's claim by engaging in a two step process. First, we determine if misconduct occurred. If it did, we then determine whether it deprived the defendant of a fair trial by applying the factors set forth in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). *State* v. *Ritrovato*, 280 Conn. 36, 62–63, 905 A.2d 1079 (2006). We will analyze separately the claims of misconduct, grouped according to the nature of the misconduct alleged.

## A

### Argument Based on Facts Not in Evidence

The defendant claims that on several occasions, the prosecutor referred to facts that were not in evidence. "It is well established that a prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . [A] lawyer shall not . . . [a]ssert his personal knowledge of the facts in issue, except when testifying as a witness. . . . Statements as to facts that

---

[7] We note that the defendant did not object to any of the arguments he challenges either at the time they were made, at the conclusion of the state's argument or prior to the time that the jury returned its verdict. Instead, the defendant raised several claims of prosecutorial misconduct in a postverdict motion for a new trial, which the court denied. Nevertheless, the defendant's claims are reviewable. See *State* v. *Stevenson*, 269 Conn. 563, 572–73, 849 A.2d 626 (2004).

have not been proven amount to unsworn testimony, which is not the subject of proper closing argument. . . . [T]he state may [however] properly respond to inferences raised by the defendant's closing argument. . . .

"A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence. . . . Moreover, when a prosecutor suggests a fact not in evidence, there is a risk that the jury may conclude that he or she has independent knowledge of facts that could not be presented to the jury." (Internal quotation marks omitted.) *State* v. *Griffin*, 97 Conn. App. 169, 179, 903 A.2d 253, cert. denied, 280 Conn. 925, 908 A.2d 1088 (2006). If counsel invites a jury to draw inferences, such inferences must be both reasonable and based on facts in evidence. See *State* v. *Lopez*, 280 Conn. 779, 803, 911 A.2d 1099 (2007); *State* v. *Rowe*, 279 Conn. 139, 159, 900 A.2d 1276 (2006).

The defendant has singled out thirteen statements made by the prosecutor during closing argument, arguing that they were not based on the facts in evidence. We have reviewed carefully each of these statements in light of the evidence presented at trial. It would serve no useful purpose for us to discuss these statements in detail. We conclude that the statements either were based directly on the evidence or that they constituted proper comment on the evidence. As stated previously, the prosecutor had the prerogative to invite the jury to draw reasonable inferences from the facts in evidence and could argue on the basis of such inferences. In so doing, the prosecutor does no more than invite the jury to apply the common sense that we expect it to bring to its deliberations. Moreover, in light of the fact that the defendant appears to have undertaken a microscopic search for inaccuracies in the prosecutor's argument, it bears repeating that "the

reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Quint*, 97 Conn. App. 72, 85, 904 A.2d 216, cert. denied, 280 Conn. 924, 908 A.2d 1089 (2006).

## B

### Argument that Denigrated the Role of Defense Counsel

The record reflects that in his closing argument, the defendant's attorney relied heavily on the fact that there was no physical evidence tying the defendant to the crimes. The defendant's attorney concluded his argument as follows: "It's your recollection that matters. I can spin things, the state's attorney can spin things, but in the end it's your decision. Has the state met its burden of proof? If not, the answer is clear. Thank you." The prosecutor began his rebuttal argument, which immediately followed, with the following statements: "Thank you, Your Honor. Ladies and gentlemen, the state of Connecticut in a criminal trial does not spin things. The state of Connecticut presents evidence, all of the relevant evidence, and allows you to decide it. And that's what happened here, all of the evidence, even the lab evidence. And while [defense counsel] may try and spin the lab evidence into some sort of acquittal of his client, I am simply going to ask that you deliberate on all of the evidence, including the lab evidence, deliberate fairly, and apply your common sense."

The defendant argues that by using the word "spin," specifically in reference to his attorney's argument, the prosecutor denigrated the role of his attorney. "It is improper for a prosecutor to denigrate the function of defense counsel. . . . [T]he prosecutor is expected to

refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel. . . . It does not follow [however] that every use of rhetorical language or device is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . [W]e are convinced that reasonable jurors are able to differentiate between lawyers' ripostes and actual evidence." (Internal quotation marks omitted.) *State* v. *Boyd*, 89 Conn. App. 1, 41, 872 A.2d 477, cert. denied, 275 Conn. 921, 883 A.2d 1247 (2005); see also *State* v. *McCleese*, 94 Conn. App. 510, 517–18, 892 A.2d 343, cert. denied, 278 Conn. 908, 899 A.2d 36 (2006). This court has recognized the distinction between argument that permissibly disparages a theory of defense and improper argument that disparages the integrity or role of defense counsel. *State* v. *Orellana*, 89 Conn. App. 71, 101, 872 A.2d 506, cert. denied, 274 Conn. 910, 876 A.2d 1202 (2005).

As set forth previously, the defendant's attorney concluded his argument by suggesting that "the state's attorney can spin things . . . ." The defendant's attorney used the word "spin," in a similar vein, at other points during his argument. The defendant's attorney first used the word "spin," and the prosecutor properly could respond to this argument during his rebuttal argument. Nevertheless, the defendant claims that the state's separate use of the word "spin," in reference to the factual argument advanced by the defendant's attorney, disparaged the integrity or role of his attorney. We must, therefore, determine what meaning the prosecutor likely conveyed or implied by use of the word. Given its context, we may conclude that the prosecutor used the word "spin" as slang. In such usage, "spin" is defined as "a particular viewpoint or bias, esp. in the media; slant . . . ." Random House Webster's Unabridged Dictionary (2d Ed. 2001). Related terms also shed light on the customary meaning of "spin."

"Spin control" is defined as "an attempt to give a bias to news coverage, esp. of a political candidate or event." Id. A "spin doctor" is defined as "a press agent skilled at spin control." Id. These definitions do not suggest that one who may be deemed to "spin" facts does something that is inherently unethical, deceitful or improper. Instead, these definitions reflect that one who "spins" facts merely presents facts with a particular bias or point of view.

Thus, whether we view the word "spin" in isolation or in the context in which it was uttered, we do not conclude that it either directly or by implication denigrated the integrity or the role of defense counsel. Cf. *State* v. *Orellana,* supra, 89 Conn. App. 103 (holding that prosecutor's use of term " 'smoke and mirrors' " constituted misconduct). We may presume that the jury was well aware that the defendant's attorney had summarized the evidence with a particular viewpoint or bias, namely, one in favor of his client. Pointing this out to the jury does not rise to the level of suggesting that a typical defense tactic has been employed; it merely states the obvious. Cf. *State* v. *Young,* 76 Conn. App. 392, 400–406, 819 A.2d 884, cert. denied, 264 Conn. 912, 826 A.2d 1157 (2003); *State* v. *Brown,* 71 Conn. App. 121, 127–32, 800 A.2d 674, cert. denied, 261 Conn. 940, 808 A.2d 1133 (2002). We may also presume, as the defendant's attorney aptly suggested in his argument, that the jury was aware that the prosecutor had summarized the evidence with a viewpoint or bias in favor of the state's case. The court's instruction to the jury, that the recollections or factual assertions presented during argument by counsel were not evidence, would have reinforced such logical presumptions. Further, it is significant that the prosecutor directed his use of the term to a specific argument made by the defendant's attorney that concerned the "lab evidence" that was presented at trial. It is likely that the jury

would have interpreted the prosecutor's statement and use of the word "spin" as a rhetorical device to remind the jury that the defendant's attorney was inviting the jury to draw inferences from the scientific evidence that were consistent with the defendant's innocence. This was not improper. Accordingly, we do not conclude that any misconduct occurred.

## C

### Argument that Vouched for the Credibility of a Witness

During his rebuttal argument, the prosecutor discussed the fact that B had recounted the details of her assault with Yarchak. The prosecutor later stated: "[B] took that [witness] stand and testified under oath that this defendant sexually assaulted her on August 5 of 2001. . . . That's right . . . [B] didn't report this crime to the police, or didn't want to report it initially. She was a prostitute, ladies and gentlemen, common sense will tell you that she's not looking to make a lot of contact with the police. But what she did report was reported accurately, and that's what the testimony indicates." The defendant claims this argument was improper because the prosecutor expressed his opinion that B had testified credibly.

"[A] prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions. . . . It is not, however, improper for the prosecutor to comment upon the evidence presented at trial

and to argue the inferences that the jurors might draw therefrom . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Luster*, 279 Conn. 414, 435, 902 A.2d 636 (2006); see also *State* v. *Warholic*, 278 Conn. 354, 365, 897 A.2d 569 (2006) ("the state may argue that its witnesses testified credibly, if such an argument is based on reasonable inferences drawn from the evidence"); *State* v. *Ancona*, 270 Conn. 568, 608, 854 A.2d 718 (2004), cert. denied, 543 U.S. 1055, 125 S. Ct. 921, 160 L. Ed. 2d 780 (2005); *State* v. *Youngs*, 97 Conn. App. 348, 372, 904 A.2d 1240 ("[i]t is not improper for a prosecutor to comment on the credibility of a witness as long as he neither personally guarantees the witness' credibility nor implies that he has knowledge of the witness' credibility outside the record" [internal quotation marks omitted]), cert. denied, 280 Conn. 930, 909 A.2d 959 (2006); *State* v. *Pedro S.*, 87 Conn. App. 183, 190–91, 865 A.2d 1177, cert. denied, 273 Conn. 924, 871 A.2d 1033 (2005).

The challenged comment concerning B's credibility reflects that the prosecutor was not arguing from a basis of secret knowledge but on the basis of the evidence presented at trial. The prosecutor clearly couched his opinion in terms of the evidence presented at trial; after opining that B had reported the incident accurately, he justified this comment by stating that "that's what the testimony indicates." "[A] prosecutor may properly comment on the credibility of a witness where . . . the comment reflects reasonable inferences from the evidence adduced at trial." (Internal quotation marks omitted.) *State* v. *Luster*, supra, 279 Conn. 438. Accordingly, we conclude that the argument was not improper.

## D

### Argument that Vouched for the Strength of the State's Case

During his principal argument, the prosecutor discussed the elements of the crimes that the state alleged

were committed against B. The prosecutor also discussed some of the evidence that the state presented in support of a conviction for these crimes. During his argument, the prosecutor stated: "Clearly, ladies and gentlemen, the evidence produced by the state leaves no doubt that this defendant committed these crimes against [B] during the early morning hours of August 5, 2001."

We already have discussed some of the arguments made by the defendant's attorney during his closing argument. Specifically, the defendant's attorney stated that "the state's attorney can spin things . . . ." Immediately following the defendant's argument, the prosecutor stated in relevant part: "Ladies and gentlemen, the state of Connecticut in a criminal trial does not spin things. The state of Connecticut presents evidence, all of the relevant evidence, and allows you to decide it."

The defendant challenges both of these arguments as improper comment by the prosecutor on the strength of the state's case. It is improper for the prosecutor to express a *personal opinion* as to the guilt of a defendant or the strength of the state's case. *State* v. *Luster*, supra, 279 Conn. 435; see also *State* v. *Martinez*, 95 Conn. App. 162, 181, 896 A.2d 109 (applying rule 3.4 of Rules of Professional Conduct), cert. denied, 279 Conn. 902, 901 A.2d 1224 (2006); see also *State* v. *Warholic*, supra, 278 Conn. 367 ("the prosecutor may argue for the reasonable inferences that the jury may draw from the evidence adduced at trial, including the defendant's commission of the crime").

With regard to the first comment, we do not conclude that it was improper because it does not reflect a personal opinion but an opinion based on the evidence. This is reflected by the fact that the prosecutor couched his favorable assessment of the state's case with the phrase "the evidence produced by the state leaves no

doubt . . . ." Furthermore, the statement was made in the context of a detailed discussion of the evidence. When the comments are based on the evidence, "[t]he prosecutor is not precluded in argument from commenting on the strength of [the state's] case . . . ." (Internal quotation marks omitted.) *State* v. *Jefferson*, 67 Conn. App. 249, 269, 786 A.2d 1189 (2001), cert. denied, 259 Conn. 918, 791 A.2d 566 (2002).

With regard to the second challenged comment, the defendant has failed to demonstrate, in the first instance, that it communicated any opinion that the state's case was strong. We see no reason to prohibit the state from arguing that it does not "spin" the facts supporting its case, that it presents evidence in support of its case or that it is up to the jury to render a decision. We are confident that such argument does not tend to sway unfairly any jury.

E

### Argument that Improperly Appealed to the Jury's Emotions

During his principal argument, the prosecutor discussed the identifications of the defendant made by B and P. The prosecutor discussed the ability of each victim, by means of a photographic array, to identify the defendant: "Let me touch briefly on [B's] identification of the defendant as the person who committed these crimes. Ladies and gentlemen, from the start, she had this photograph in her mind, photograph number four, developed from sitting less than three feet from this defendant when she was in his car. That photograph was developed in her mind while standing face to face with him in the woods down Old Mansfield Road at the back of the truck. It was developed from looking at him while he grabbed her by the hair and pressed a knife to her back, then forced her to perform oral sex on him. Those actions seared that photograph into her

brain." Discussing P's identification of the defendant, the prosecutor argued: "Remember, [P] identifies [the defendant] out of the photo lineup. She has this photograph, number four, seared into her memory, too. She sat next to him in that car, and she described how, when she walked up to that car, it was a fairly well-lit area . . . . The fact that this [assault] happened to her the way it did, and the close proximity between her and this defendant, during that period of time, allows her to create that photograph in her mind, and she is waiting to see it developed in front of her in a lineup, and when she does, she selects it instantly, no hesitating, no doubt."

The prosecutor also stated that P ran from the scene of the assault and invited the jury to find that the medical records concerning P's treatment following the assault corroborated her testimony concerning the manner in which the assault occurred. The prosecutor argued: "I think [that] when you review [the medical records], you will find that they corroborate [P's] testimony before you, and that would make sense, wouldn't it, ladies and gentlemen? Would you go to your doctor, would you go to the people trying to help you out, trying to make you feel better, and tell them a lie or tell them inaccurate information as to how you were attacked?"

Also, during his rebuttal argument, the prosecutor discussed the arguments made by the defendant's attorney concerning alleged evidentiary deficiencies in the state's case. After attempting to discount some of these arguments, the prosecutor stated: "[T]hey cling to this notion, somehow, that the state hasn't proven this case beyond a reasonable doubt; they cling to that like a life raft." The prosecutor then referred to the testimony of B and P, and stated that "[the evidence] drills hole after hole after hole into that life raft of his until it sinks and he's drowned in a sea of guilt. Ladies and gentlemen, he is guilty as charged; that is not spin."

The defendant argues that all of these arguments improperly appealed to the emotions of the jury. "It is well established that, [a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . We have stated that such appeals should be avoided because they have the effect of diverting the jury's attention from their duty to decide the case on the evidence. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Internal quotation marks omitted.) *State* v. *Bermudez*, 274 Conn. 581, 595–96, 876 A.2d 1162 (2005), after remand, 95 Conn. App. 577, 897 A.2d 661 (2006).

We conclude that the arguments concerning the ability of the victims to identify the defendant accurately were not improper. The defendant does not explain why these arguments improperly appealed to the jury's emotions but argues that "[t]here was no testimony regarding the ability of persons in [B's] alleged circumstances to recall a person's identity." Although we acknowledge that the evidence concerning the sexual assault crimes might have aroused the emotions of the jury, the prosecutor's discussion of this evidence to prove the state's case or in argument that the victims accurately identified the defendant was not improper.

The defendant does not justify his claim that the prosecutor's statement that P ran from the scene of the assault was an appeal to the jury's emotions, and we will not formulate a claim on his behalf. With regard to the argument concerning P's medical records, the defendant claims that the prosecutor "asked the jury to step into the shoes of [P] regarding her speaking with medical care providers following the alleged assault." We disagree with this characterization of the argument. It is clear that the prosecutor referred to the

medical records in an effort to corroborate P's trial testimony. Medical records of this nature are admissible for the very reason that the law presumes that persons will communicate truthfully with care providers.[8] Here, the argument directed the jury to consider whether P communicated truthfully with care providers after the assault by inviting them to consider whether they would have been truthful with care providers under similar circumstances. The argument was an invitation for the jurors to apply their common sense to the matters before them and not an appeal to their emotions.

Finally, the defendant argues that the "life raft" analogy, obviously employed as a rhetorical device, improperly appealed to the emotions of the jury. Because he has failed to provide any meaningful analysis of this aspect of the claim, we decline to address it.

## F

### Conclusion

The defendant has not demonstrated that any misconduct occurred.[9] Accordingly, he cannot demonstrate that misconduct deprived him of a fair trial.

The judgments are affirmed.

In this opinion the other judges concurred.

---

[8] "Our Supreme Court has held that [t]he rationale for excluding from the hearsay rule statements that a patient makes to a physician in furtherance of obtaining medical treatment applies with equal force to such statements made to other individuals within the chain of medical care. In each case, [there is a presumption] that such statements are inherently reliable because the patient has an incentive to tell the truth in order to obtain a proper medical diagnosis and treatment." (Internal quotation marks omitted.) *State v. Anderson*, 86 Conn. App. 854, 877, 864 A.2d 35 (2004), cert. denied, 273 Conn. 924, 871 A.2d 1031 (2005).

[9] There being no showing of misconduct, we need not address the defendant's request that we exercise our supervisory authority to remedy any misconduct that occurred.